## JONES et al. v. HARRIS et al. †

(Court of Civil Appeals of Texas. San Antonio. June 7, 1911. On Motion for Rehearing, July 1, 1911.)

1. HUSBAND AND WIFE (§ 273*)—COMMUNITY PROPERTY—SALE BY SURVIVING SPOUSE—VALIDITY.

A surviving husband may in good faith sell community real estate to pay community debts without administration of the estate, though the property is sold for more than enough to pay the debts.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1019–1021; Dec. Dig. § 273.*]

2. HUSBAND AND WIFE (§ 273*)—SALE OF COMMUNITY REAL ESTATE—RIGHTS OF SURVIVING SPOUSE.

That a surviving husband conveyed community real estate to pay community debts is shown by the fact that the proceeds were used to pay debts, notwithstanding his sworn statement that he did not sell to pay community debts.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1019–1021; Dec. Dig. § 273.*]

3. HUSBAND AND WIFE (§ 273*)—COMMUNITY PROPERTY—SALE BY SURVIVING SPOUSE—TITLE OF PURCHASER. •

A surviving husband sold community real estate to pay debts. He received full value for the premises. The deed recited that he conveyed all his "right, title, and interest" in the land. He used the proceeds to pay debts. *Held*, that the purchaser acquired the entire community interest of the husband and the deceased wife.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1019–1021; Dec. Dig. § 273.*]

4. HUSBAND AND WIFE (§ 267*)—COMMUNITY PROPERTY—SALE BY HUSBAND.

A grantee of a purchaser of state lands who agrees to pay the state a specified sum per acre, and who moves on the land with his wife and family, may, during the life of his wife, convey without her consent, in order to relieve himself of his burden to the state, or he may forfeit the land to the state.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 930; Dec. Dig. § 267.*]

5. HOMESTEAD (§ 146*)—SALE BY SURVIVING HUSBAND.

A surviving husband may sell the homestead to pay debts against the community estate, though there are minor children and the estate is insolvent.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. § 257; Dec. Dig. § 146.*]

6. EVIDENCE (§ 165*)—BEST EVIDENCE—WRITTEN INSTRUMENTS.

A deed is the best evidence of what is thereby conveyed, and the testimony of the grantor as to what he conveyed is properly rejected.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 548–555; Dec. Dig. § 165.*]

### On Motion for Rehearing.

7. HUSBAND AND WIFE (§ 273*)—SALE OF COMMUNITY PROPERTY—CONDITION PRECEDENT.

The power of a surviving husband to sell community real estate is dependent on the existence of community debts, and a purchaser who has knowledge of the existence of such debts need not see that the purchase money is appropriated to the payment thereof.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1019–1021; Dec. Dig. § 273.*]

Neill, J., dissenting.

Appeal from District Court, Ft. Bend County; Wells Thompson, Judge.

Action by W. R. Jones and others against O. O. Harris and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

Guynes & Colgin and Chas. L. Michael, for appellants. D. R. Pearson, for appellees.

FLY, J. This is an action of trespass to try title to an undivided one-half interest in 320 acres of land, said 320 acres being the S. W. ½ of section 6, Houston & Texas Central Railway Company, instituted by appellants against appellees. A jury was demanded and impaneled in the cause, but the court, after hearing the evidence, instructed a verdict for appellees, and from the judgment thereon rendered this appeal is perfected.

The evidence in this case shows that Alex Vallet, on December 15, 1892, purchased from the state of Texas 640 acres of land and fully complied with the law in relation thereto, and on January 3, 1893, one-half of the land was sold by Vallet to W. J. Jones, the father of appellants, being the S. W. ½ of the section, and he fully complied with the law in relation thereto. Jones obligated himself to pay the state of Texas $2.50 an acre for the land; that is, $800. He was a married man at the time, with a number of children. He moved with his family on the land, put 100 acres in cultivation, built a house and made other improvements of the value perhaps of $1,000. He lived on the land up to the time of the death of his wife, Ara J. Jones, which occurred on October 21, 1894, and up to the time when he sold the land. On September 14, 1896, he sold 200 acres of the land to D. Braswell, and on April 28, 1897, he sold the remaining 120 acres to B. R. Brown. Jones swore that he was indebted to the state of Texas on the 200 acres that he sold to Braswell in the sum of $600, and that he was indebted to the state in the sum of $360 on the 120 acres when he sold to Brown. He was also indebted to Brown on a debt incurred during the life of his wife. His vendees assumed the debts to the state of Texas. The community debt to Brown amounted to about $300.

[1] The uncontroverted proof showed that when the property was sold by the surviving husband he was indebted to the state of Texas in the sum of $960 for the land, and he owed Brown $300, and other debts to Westendorf and Dr. Bailey, all of which sums were community debts. The evidence leaves no question of doubt that the sums due the state and Brown were paid out of the pro-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error denied by Supreme Court.

ceeds of the land. It was not alleged, nor sought to be proved, that the survivor did not act in good faith in the sale of the land, and he undoubtedly had the right to sell the land to pay the community debts without administration of the estate. And it was the right of the surviving husband to sell the land for the payment of community debts, even though the property was sold for more than enough to pay off the debts. Johnson v. Harrison, 48 Tex. 257; Wenar v. Stenzel, 48 Tex. 484; Watkins v. Hall, 57 Tex. 1; Ashe v. Yungst, 65 Tex. 631; Sanger v. Moody, 60 Tex. 96; Walker v. Abercrombie, 61 Tex. 69; Manchaca v. Field, 62 Tex. 135; Moody v. Snoot, 78 Tex. 119, 14 S. W. 285.

[2] That W. J. Jones may have sworn that he did not sell the land to pay community debts, does not alter the fact that he had not paid the community debts, and the purchase money of the land was used to discharge those debts. The best proof on earth that property was sold to pay certain debts is that the money arising from the sale was used for that purpose. There was no evidence that he owned any other property, or that he could have paid the debt in any other way. The Jersey cattle which he received in part payment for the land were used to support and educate some of the appellants in this suit. The debt on the land, instead of having diminished, had been steadily growing, and it was clear that the whole of it would have been lost, if the survivor had not sold it for enough to pay off the debts due on it, and appellants have no cause to complain that he received more than enough to pay off the debts, because the surplus was used for their benefit.

[3] After W. J. Jones made the deed to Braswell to the 200 acres of land, he immediately abandoned it and moved to another locality. When he sold the 120 acres to Brown he was living in the town of Rosenberg, and not on the land, and all the circumstances tend to show that he intended to convey by his deeds, not all of his right, title, and interest in the land as contradistinguished from the interest of his children, but all of his right, title, and interest in view of the debt he was owing on the land to the state of Texas. The vendees construed the deeds in that way, and assumed payment not of a part of the debt to the state, but of the whole debt, and the state of Texas recognized them as the vendees of the whole of the land and substituted them for Jones in the purchase of the land. He received full value for the land. W. J. Jones swore that Braswell paid him $800 in money, $1,200 in cattle, and assumed a debt to the state of $600, making a total of $2,600, and that Brown paid $650 in money, $100 in trade, and $360 to the state, and canceled a debt of $600 which Jones owed, making a total of $1,710 paid by Brown for the 120 acres. For the 320 acres Jones received $4,310, and yet

it is insisted that the sum mentioned was paid for a mere chance of title in 160 acres of land. The 200 acres was sold by Braswell for $9 or $9.50 an acre, and the 120 acres was sold by Mulcahy, a vendee of Brown, for $750, which was shown to be their market value. Jones did not swear to the market value of the land, although he placed a fancy value on it, without reference to the market value. The irresistible conclusion from all the facts and circumstances is that W. J. Jones intended to convey all the rights acquired from the state by virtue of his purchase of the land.

W. J. Jones did not make proof of three years' occupancy when he moved on the land, for the simple reason that it had been only about a year since Vallet, his assignor, bought the land from the state in 1892. Proof of three years' occupancy could not have been made prior to the death of Mrs. Ara J. Jones, because she died in October, 1894, about two years after Vallet bought the land from the state. In fact there is no evidence that W. J. Jones ever made proof of occupancy. It is true that Jones swore, "I simply made my proof of occupancy and made a partial payment," by which he evidently referred to his application to purchase which appears in the record. None of the appellants has ever applied to the Commissioner of the General Land Office to be substituted for W. J. Jones or took any steps in regard to the land for nine years after it had been sold by W. J. Jones. Mrs. Stella Harris, one of the appellants, swore, however, that they tried to get their part of the purchase money from their father, after he sold the land, thereby showing that they believed that he had sold the whole of it.

In the deeds to Braswell and Brown, W. J. Jones states that he conveyed "all my right, title, and interest" in the land, and it is the contention of appellants that the deed conveyed only the community interest of Jones in the land. We are of the opinion that the deed on its face conveyed the entire community interest that Jones and his deceased first wife had in the land, and the circumstances, which will be hereinafter referred to, show conclusively that such was his intention, and having so conveyed such interest there was no issue to go to a jury, and the court did not err in instructing a verdict for the appellees.

In the case of Carter v. Conner, 60 Tex. 52, a judgment on a community debt had been obtained against a surviving husband, and certain land, community property, was levied on to satisfy it, and when the land was sold the sheriff executed a deed conveying all the right, title, and interest of the husband in the land, and the Supreme Court held: "Although the judgment is against the husband alone, it is for a community debt; and as in the lifetime of the wife an execution upon it would have been leviable upon the com-

munity property, so after her death the same kind of levy would be proper. As in her lifetime, so after her death, the execution would command the sheriff to levy on the property of the husband, and the levy, sale, and deed to the purchaser would show that all these passed only the right, interest, title, and claim of the husband, yet after her death, as well as before it, carried the community interest of both the husband and the wife. The right, title, interest, and claim which the husband has in the property in the lifetime of his wife, so far as the payment of debts is concerned, is no more than it is after her death. He owns the half, and can manage and dispose of all in either case for such purposes. We have seen that even in commercial partnerships the survivor has a legal right to the whole assets which may be sold in payment of partnership debts; the legal right of the husband is fully as strong, and in selling it all the partnership or community title passes to the purchaser." If that be true in regard to the sale under an execution of the right, title, and interest of the husband, there can be no valid reason given why the voluntary conveyance by the husband, either before or after the death of the wife, in satisfaction of community debts, of his right, title, and interest would not convey the entire property. But the Supreme Court did not leave this in doubt to be reached only as a matter of inference, but in the same case said: "The doctrine that a conveyance of the personal interest of the husband in the community property, after the death of his wife, carries the title both of himself and the wife's heirs, when there exists an incumbrance upon the property which is removed by the conveyance, is well established. Stramler v. Coe, 15 Tex. 211." A number of authorities were cited to sustain the opinion of the court, and it has since been cited many times with approval. Roy v. Whitaker, 92 Tex. 346, 48 S. W. 892, 49 S. W. 367; Boyd v. Ghent, 93 Tex. 543, 57 S. W. 25; Hill v. Osborne, 60 Tex. 390; Hollingsworth v. Davis, 62 Tex. 438; Hinzie v. Robinson, 21 Tex. Civ. App. 9, 50 S. W. 635; Davies v. Thompson, 50 S. W. 1062; Barrett v. Eastham, 28 Tex. Civ. App. 189, 67 S. W. 198.

In the case of Jones v. Jones, 15 Tex. 143, the court, through Chief Justice Hemphill, discussed the powers and authority of the surviving husband over the community estate and said: "As survivor he had competent authority to discharge the debts of the partnership; and whether the discharge of debts, or any act which he might lawfully do as survivor, be done in his own name simply, or in his name as survivor, is immaterial. The law, for the preservation of rights, would look to the substance and not to the form. In fact no such form has been adopted in practice, nor is it essential that it should."

In the case of Corzine v. Williams, 85 Tex. 499, 22 S. W. 399, the surviving wife, as administratrix, had made a conveyance of a land certificate, community property, in which she described the property to be conveyed as "all the right, title and interest of the late Shelby Corzine," and the Supreme Court held that it conveyed the whole certificate, her own interest as well as that of her deceased husband. The court said: "But in the lifetime of the husband the community estate is managed in his name, and upon his death it is administered in his name, and sold and conveyed simply as his property. Therefore, we are of opinion, that if the facts recited in the deed had been true it would have passed n)t only the interest of the deceased husband in the certificate, but also that of his wife."

[4] Undoubtedly during the lifetime of his wife W. J. Jones could have sold the community interest in the land to pay off the obligations assumed by him to the state of Texas. It was an onerous debt he had assumed, running through 40 years, and he had the authority to rid himself of its burdens either by abandonment of the land, thereby forfeiting it to the state, or by sale to another. He could have made an assignment of the community rights, if he acted in good faith, without the consent of his wife, and that power and authority was not taken from him by the death of the wife. He still had the power to abandon the land and forfeit his rights to the state, and he had the right to sell it in order to relieve himself of a burdensome debt, which he was making no progress in discharging. He chose the latter plan, and when he conveyed all his right, title, and interest in the land, he conveyed all the interest the community partnership had obtained from the state. He then exercised his right and prerogative of abandoning the land, and of breaching the contract of sale made between him and the state, and his vendee was then recognized by the state as a substitute for Jones, just as he had been recognized as a substitute for Vallet, the original purchaser.

Having shown without contradiction that the land was incumbered with obligations to the state, that the debt was not being decreased, that the community owed other debts, that a sale of the entire land was made and the obligations discharged and the debts paid, there was no question of fact to be submitted to a jury, and the court properly instructed a verdict in consonance with the undisputed facts.

W. J. Jones had given his obligation to the state of Texas to pay certain sums at certain times, together with interest, and if that obligation did not constitute a debt, neither would notes for the purchase money of land to an individual constitute a debt. In addition all of the witnesses who testified at all about the indebtedness of $600 to

Brown swore that at least a portion of it was made during the life of the deceased wife. Of course all homestead rights in the land were subordinate to the debt due the state, and it cannot be urged that appellants had the right to complete their title by making payments to the state when they become due, when the parts of the debt have been becoming due year after year and no attention has been paid to them by appellants, who have by their acts abandoned any rights they may have had, and are now endeavoring to avail themselves of the industry and payments made by others.

Under the terms of the contract of W. J. Jones, he was to pay the state $780, 5 per cent. interest thereon, and one-fortieth of the principal to be paid annually. It was like any other debt, except that it was made the duty of the Land Commissioner, in case of a failure to meet a payment, to forfeit the land to the state without necessity of re-entry or judicial ascertainment, and even in a case where there was a failure to pay the interest and part of the principal at the appointed time if there was no forfeiture, there was a penalty of 20 per cent. We cannot conceive of any more onerous debt. W. J. Jones and appellants forfeited all their rights year after year and the only reason that their contract was not in terms forfeited by the Land Commissioner was because he recognized Braswell and Brown as being the assignees of W. J. Jones of all the right, title, and interest in the land granted by reason of the application of W. J. Jones to purchase and the execution of his obligation. An incumbrance, as contemplated in Carter v. Conner, rested upon the land which Jones, by his conveyance of his right, title, and interest of all the community interest, sought to remove and did remove. If the deed of W. J. Jones was a mere quitclaim conveyance, it was a quitclaim to all the interest the community had in the land. We are of the opinion that the conveyance was intended to convey all the title that the vendor had by reason of his contract with the state, which was all the title any one had.

While the case of Creamer v. Briscoe, 101 Tex. 490, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869, seems to establish the peonage of the surviving husband in favor of his children, and places a very onerous burden on him, still that decision cannot be invoked to deny the right of the survivor to sell land bought from the state to relieve himself of the incumbrance resting thereon. The decision does not compel the father to spend his life to obtain land for his children by a deceased wife, but gives one-half of it to them if the father is willing to so enslave himself. The decision fully recognizes the right of the husband to sell land bought from the state without the assent of the wife, and it follows that if he could sell for debts before her death he could after-

wards. No homestead rights had accrued before the death of the wife, nor were they acquired afterward. Mitchell v. Nix, 1 Posey, Unrep. Cas. 126.

[5] Even if the land had been a homestead, the surviving husband had the power to sell it for the purpose of paying debts against the community estate, although there were minor children and the estate was insolvent. Ashe v. Yungst, 65 Tex. 631; Fagan v. McWhirter, 71 Tex. 567, 9 S. W. 677; Watts v. Miller, 76 Tex. 13, 13 S. W. 16; Martin v. McAllister, 94 Tex. 567, 63 S. W. 624. As said in the last case, "The exemption of the homestead and other property was in favor of the father, the head of the family, and did not inure to the benefit of the children on the death of their mother."

It cannot be questioned that W. J. Jones could at any time have abandoned the land and forfeited the purchase made from the state. The law did not impose upon him the duty of remaining on the land, and laboring to pay off the debt to the state, and especially would this be true in view of the fact that he had not only been unable to reduce the debt, but had failed to keep it from increasing. The facts indicate that two alternatives were offered him, an abandonment or a sale, and the survivor adopted the latter, the undoubted wiser course of the two. His children have no just ground of complaint because he was unwilling to spend his remaining days working to pay for a home for them. He had the right to abandon the place and forfeit the contract with the state.

The evidence, the rejection of which is complained of in the sixth assignment of error, had no bearing upon the issues in the case, and was properly rejected.

[6] The testimony of W. J. Jones as to what he conveyed by the deed was properly rejected. The deed was the best evidence of what was conveyed thereby. That, together with all the attending circumstances, indicates that the whole of the interest in the land acquired by the purchase from the state was conveyed. The state authorities so construed it, as did every one connected with the transaction, and W. J. Jones would not be allowed, years after the deed was executed, to impeach it.

The admission of the power of attorney by Lillie Rulfs to Charles L. Michael had no bearing upon the issues of the cause so far as appellant's claim to the land was concerned, and its admission in evidence could not have damaged them. The questions presented under the assignments of error complaining of the evidence are mere abstractions in view of the fact that appellants own no interest in the land.

The judgment is affirmed.

NEILL, J. (dissenting). I cannot agree with the opinion of the majority of the court in this case, and will make my own state-

ment of it, instead of adopting that contained in the majority opinion.

The suit was instituted by the appellants, W. R. Jones, Terry Jones, Stella Jones Harris, joined by her husband, C. C. Harris, Lillie Jones Rulfs, joined by her husband, Tony Rulfs, Mabel Jones Ernest, joined by her husband, C. A. Ernest, Willie Jones Ponder, joined by her husband, J. O. Ponder, and Ruby Jones Clark, joined by her husband, C. Clark, minors by their next friend, Terry Jones, Alice Jones for herself and as next friend for her minor child, Fred Jones, against O. O. Harris and D. S. Harris and G. M. Sadler, who had, prior to filing plaintiffs' second amended original petition, on which the case was tried, intervened, to recover an undivided one-half interest in the S. W. ½ of section No. 6, certificate No. 183, Houston & Texas Central Railway Company survey, Ft. Bend county, Tex., it being an undivided one-half interest in the land conveyed by Alex Vallet to W. J. Jones, as is of record manifest. Volume Z, p. 2, in Deed Records of Ft. Bend county, Tex. Plaintiffs, besides suing to recover title to and possession of the land, sued to recover damages in the sum of $5,000 for defendants' use and occupation of the land. The defendants pleaded not guilty and all the statutes of limitations prescribed in the Revised Statutes of this state, and improvements in good faith. By supplemental petition, all the plaintiffs plead infancy and coverture. The case was tried before a jury, and after all the evidence was heard, the court peremptorily instructed a verdict for the defendants, and upon the verdict returned in obedience to the charge the judgment appealed from was entered.

The record discloses that the suit was originally instituted on October 4, 1905, and was dismissed under a rule for costs, October 29, 1906; and that on November 1, 1906, at the same term, the order of dismissal was set aside and the cause reinstated; that afterwards, on November 18, 1907, a judgment was rendered for plaintiffs, though not entered on the minutes of the court, and that a motion of plaintiffs to have such judgment entered nunc pro tunc was denied on April 12, 1909, and such judgment was declared void, set aside upon agreement of the parties; and that this suit was pending when Sadler bought.

The evidence shows that W. J. Jones and Ara J. Jones, deceased, were married March 3, 1873, and that the plaintiffs, save those who are joined as parties pro forma with their wives and Alice and Fred Jones, wife and son of H. J. Jones, deceased, are the issue of their marriage, and that H. J. Jones, deceased, was also their son.

On December 15, 1892, Alex Vallet in due form made application to the Commissioner of the General Land Office to purchase, as an actual settler, the 640 acres survey, of which the land involved in this suit is a part, classed as dry agricultural land, at $2.50 per acre, and executed his writings obligatory to the state of Texas for $1,500, the purchase money, in accordance with law, which were accepted by the state, and the land was duly awarded to him on his application in accordance with the terms of his purchase.

On January 30, 1893, Alex Vallet by his deed of that date sold, conveyed and assigned to W. J. Jones the S. W. ½ of the section of land so purchased by him (Alex Vallet) from the state. In said instrument the grantor expressly made Jones his assignee so that patent could be issued by the state to him, his heirs or assigns provided that he, the said W. J. Jones, comply strictly with all the conditions and requirements in the legislative acts and amendments pertaining to the purchase and assignments of such lands, as an actual settler thereon. This instrument was duly acknowledged and filed for record in the office of the county clerk of Ft. Bend county on February 13, 1893.

After having purchased the 320 acres from Vallet, W. J. Jones, together with his wife, Ara J. Jones, and his children, plaintiffs in this suit, moved upon the land and made valuable improvements thereon. Such improvements consisted of fencing the land, breaking up a hundred acres of the same, building a house, digging a well, erecting a barn and planting trees, which approximated the value of $1,000, if the testimony of plaintiffs is to be believed. After he, with his family, moved on the land, W. J. Jones made his proof of three years' occupancy, paid the state of Texas, according to his best recollection, $500, paid interest to the state and taxes as they accrued. They lived for more than a year on the land as their homestead.

Ara J. Jones died October 21, 1894, leaving surviving her W. J. Jones, her husband, and all the children of their marriage named as plaintiffs in this case, and all were living when this suit was brought, except Horace J. Jones, whose surviving wife and son are parties plaintiff. The dates of their births and marriages are as follows: Horace Jones, born April 9, 1875; married Alice Jones; died September, 1897, leaving one child, Fred Jones, and a surviving widow, Alice Jones, who are his sole and only surviving heirs. Stella Jones, born October 21, 1877; married C. C. Harris September 25, 1904. W. R. Jones, born January 29, 1879. Terry Jones, born June 2, 1882. Lillie Jones, born January 29, 1884; married Tony Rulfs July 6, 1904. Mabel Jones, born February 8, 1886; married C. A. Ernest, March 6, 1904. Ruby Jones, born February 16, 1888; married Crawford Clark, October 2, 1905. Willie Jones, born December 31, 1891; married J. O. Ponder, November 11, 1908. W. J. Jones never qualified as survivor of the community nor took out letters of administration on the estate of his deceased wife, Ara J. Jones.

On September 14, 1896, W. J. Jones executed and delivered to D. Braswell the following deed: "The State of Texas, County of Fort Bend. Know all men by these presents, that I, W. J. Jones of the County of Fort Bend, and State of Texas, for and in consideration of the sum of Fourteen Hundred Dollars to me in hand paid by D. Breeswell of Caldwell Co. of the County of and State of Texas, the receipt of which is hereby acknowledged, do by these bargain, sell, release and forever quit-claim unto the said D. Breeswell heirs and assigns all my right, title and interest in and unto that tract or parcel of land lying in the County of Fort Bend and State of Texas, described as follows, to-wit:—The South 220 acres of the S. W. ½ of Section 6, H. & T C. R. R. Survey, Certificate 183, original Grantee Alex Vallett? It is expressly understood that two Vendor Lien notes of two hundred dollars each, 1st. due and payable one year after date and No. 2 due and payable two years from date with interest at eight per cent. per annum is retained in part payment for the above consideration. To have and to hold the said premises, together with all and singular the rights, privileges and appurtenances to the same in any manner belonging unto the said D. Breeswell, his heirs and assigns, so that neither myself, the Grantor herein, nor my heirs or any person or persons claiming under me shall at any time hereafter have claim, or demand any right or title to the aforesaid premises or appurtenances, or to any part thereof. Witness my hand this 14th day of September, A. D. 1896. W. J. Jones."

This deed was properly acknowledged, though the date of the notary's certificate does not appear thereto, and was filed for record in the office of the county clerk on September 20, 1896.

On October 28, 1896, D. Braswell made a quitclaim deed to W. J. Jones to 20 acres off the northwest of the south 220 acres of the southwest half of said section; the consideration expressed in the deed was $130 cash. On April 28, 1907, W. J. Jones for the expressed consideration of $630, the receipt of which was acknowledged, made a deed to B. R. Brown in which the habendum clause is as follows: "I remised, released and quitclaim and by these presents do for myself, my heirs, executors, and administrators remise, release and forever quitclaim and convey unto the said party of the second part (Brown) and to his heirs and assigns forever all my right, title, interest, estate, claim and demand both at law and in equity of, in and to all of a certain tract of land situated in Fort Bend County, Texas, known as part of section No. 6, Certificate No. 183 and described as follows: [Here follows a description of 120 acres of said survey.]" The tenendum clause in the deed is: "To have and to hold the above described premises unto the said B. R. Brown, his heirs

and assigns so that neither I, the said W. J. Jones, or any person in my name and behalf shall or will hereafter claim or demand any right, title to the same or any part thereof, but they and every one of them shall by these presents be excluded and forever barred."

On January 19, 1898, B. R. Brown quitclaimed all his right, title, and interest in that land, which was remised, released and quitclaimed to him by Jones to R. T. Mulcahy. On December 11, 1902, R. T. Mulcahy quitclaimed to O. H. Harris, one of defendants, all his right, title, and interest in said 120 acres of the land.

On January 2, 1903, D. Braswell and his wife, Laura B., for the expressed consideration of $500 cash and four promissory notes, one for $221.11, and each of the other three for $221, payable respectively in one, two, three, and four years from date thereof with interest at the rate of 8 per cent. per annum, conveyed to D. S. Harris, another defendant, the 200 acres of the tract which W. J. Jones had conveyed to said Braswell. The habendum clause in this deed of conveyance is as follows: "Have bargained, sold, conveyed and quitclaimed and by these presents do bargain, sell and quitclaim unto the said D. S. Harris, all our, and each of our right, title, interest, estate, claim and demand in and to a certain tract or parcel of land," etc., describing the land; and the tenendum clause is: "To have and to hold, the above described premises to the said D. S. Harris and his heirs and assigns forever."

On January 12, 1907, D. S. Harris and O. O. Harris, by separate instruments, sold said tract of 200 and 120 acres to G. M. Sadler, and the state of Texas, in separate patents, patented the two tracts to him as assignee of Alexander Vallet, on March 21, 1907.

W. J. Jones, plaintiffs' father, testified that Braswell paid him $800 in money and $1,200 in cattle for the 200 acres he sold him; that Brown paid him for the 120 acres $650 in money and $100 in trade; that the reason why he sold his interest in the land was that, his wife having died, he decided to move to town where he could give his children an education; that he did not sell either tract to pay existing debts, and that when he sold he did not owe any man except Mr. Brown, whom he owed a small account which, to the best of his recollection, was less than $100, and that such debt did not in any way influence him to sell the land; that the 200 acres sold Braswell was worth $6,000, and the 120 acres sold Brown was worth about $15 per acre, the latter tract being unimproved; that he also owed Mr. Westendorf for funeral expenses when he sold to Braswell, which he had paid, though not from the proceeds of sale of the 200 acres sold to Braswell; that the only person he owed when he sold the 120 acres to Mr. Brown was Brown himself; that he owed the state of Texas at the time of the

sales, respectively, $600 on the 200 acres, and $360 on the 120 acres; that he never paid for the land in full, but simply made proof of occupancy, and made a partial payment (in all, less than $500) and that the parties to whom he sold assumed the amount he owed the state.

D. Braswell testified that he knew Mrs. Jones was dead at the time he purchased and that she had children; that he did not know that Jones owed any debts; that Jones did not give any reasons for wanting to sell, but that he (witness) believed that he (Jones) said he was thinking about moving to Arkansas; that Jones did not say anything to him at all about his debts and that he (Braswell) never went to any of his creditors to ask anything about it.

B. R. Brown, to whom the deed for 120 acres was made, testified: That the amount W. J. Jones was indebted to him before he bought was about $600; that part of the debt was contracted before his wife's death and a part afterwards; that it seemed to him she had been dead a couple of years before he got a settlement; that about half of the debt was contracted before her death; that he could not say as to the dates the articles were purchased; that to his best recollection Jones' intention was there was to be a settlement of that debt and to get a little cash in addition; that he could not give anything definite as to how much Jones owed him; that he was satisfied that there was a cash consideration as well as store account; that he knew Jones' wife, Ara J. Jones, was dead, and that she died on that same place, the land in controversy, and left several minor children; that the amount he paid Jones was $630; that there was no examination of the title to the land, nor necessity therefor, when he bought it; that he knew the children of Mrs. Ara J. Jones were living at the time and that they had an interest in the land. In reply to the question, "Isn't it a fact that you only bought such interest as W. J. Jones owned?" he answered: "Well, there was nothing said about that, but I supposed it should have been in law."

These further questions were asked him: "What reason, if any, was mentioned by W. J. Jones for not giving you a warranty deed?" "Isn't it a fact that he told you he could not convey the right of his children, without going through the courts for that purpose?" to which he answered: "Well, the reason was that he couldn't give a warranty deed. Well, I couldn't say positively about that. * * * He gave me a quitclaim deed."

G. M. Sadler, the intervener, who, in plaintiffs' second amended original petition, was made a party defendant, testified that when he bought he knew the land had been in litigation, though he was not at all familiar with the suit; that when he asked his attorney about it, he said it had been in litigation but the title was all right; that his at-

torney also stated that there had been a suit pending for some time, suit against the land at one time, and that he did not know just how long it had been dismissed; that the reason he paid all the money at one time was to get a title and have the land clear, and that it was not done in order to cut plaintiffs out of the land.

This is deemed a sufficient statement of the case and of the evidence introduced to determine the question whether the trial court erred in peremptorily instructing the jury to return a verdict for the defendants, as is complained of in the first assignment of error.

It is too well settled to require a citation of authorities that, when the evidence raises an issue of fact upon which the rights of the parties to the suit depend, it is error to withdraw such issue from the jury by a peremptory instruction to return a verdict in favor of either party. If, then, there were such an issue of fact developed upon the trial of this case, the court's charge was erroneous, and the judgment should be reversed for that reason.

It cannot, in view of the undisputed evidence, be questioned that under the law of this state when the land was purchased by W. J. Jones from Alex Vallet it became the community property of himself and wife, Ara J. Jones, the mother of plaintiffs (Creamer v. Briscoe, 101 Tex. 490, 109 S. W. 911, 17 L. R. A. [N. S.] 154, 130 Am. St. Rep. 869); nor can it be denied that upon her death, which occurred on October 12, 1894, her community interest of an undivided half of the property descended to and vested in her children.

Putting aside, for the present, the fact that the property, to the extent of at least 200 acres, was the homestead of W. J. Jones and his family, it will be assumed that the mother's half interest in the land descended to her children charged with its pro rata share of the community indebtedness, for the purpose of determining whether it appears as a matter of law that the interest in the land inherited by plaintiffs from their mother was conveyed by their father in the deeds made by him to D. Braswell and B. R. Brown above referred to; and if conveyed, whether the conveyance was made for the purpose of applying any of the proceeds of sale of their interest to the payment of the community indebtedness. Unless such interest was so conveyed, the title to such inheritance is still in plaintiffs, if not extinguished by the statute of limitations; and, as their father had no power to sell their interest except for the purpose of discharging the community indebtedness, if not conveyed for that purpose, they still have such interest. The effect of the deed of W. J. Jones to Braswell will be first considered.

This deed, while not in the strictest form of a quitclaim, shows that Jones only sold,

released, and quitclaimed to Braswell all his right, title, and interest in the 200 acres. Ordinarily, when there is no mistake, fraud, or ambiguity in a written instrument (and none is either alleged or proved as to this one) it cannot be extended by construction beyond what is written within its four corners; for the clear meaning of the language appearing upon the face of the instrument must determine its character, effect, and operation. This principle of construction applies as well to deeds as all other writings in which the parties have registered their contract or agreement. It is "sealed," and the seal cannot be broken so as to open the instrument to any other construction, unless fraud or mistake—which no seal can sanctify nor perpetuate—be alleged or proved.

But language used in some of the opinions of the Supreme Court of this state has been taken to mean that, whenever it is claimed that an instrument is a quitclaim deed, either in form or effect, extraneous evidence may be looked to to determine the real intention of the parties. An examination of all the cases, where extraneous evidence has been admitted for that purpose, will show that the question of fraud or mistake in drafting the instrument, or some ambiguity as to its meaning, has been presented; and, then, such evidence was considered only for the purpose of determining the real intention of the parties. No such question is presented in this case by the pleadings or evidence introduced by any of the parties. If, however, there were such a question, it would be of fact for the jury to determine; and hence, error for the court to withhold it from their consideration by peremptorily instructing a verdict for the defendants, as was done in this case. But the evidence of both the grantor and grantee, introduced in this case, shows that such instrument is just what its plain language imports—a quitclaim deed. The extent of its operation was to pass all the estate Jones could convey by, a deed of bargain and sale. And as he only had a right, title, and interest in an undivided half of the land, his deed only operated, as is shown by its face, to convey such right, title, claim, and interest. Hence the right, title, claim and interest to his deceased wife's heirs to the other half remained in them unaffected by such deed.

The deed from W. A. Jones to B. R. Brown is a quitclaim in the strictest sense of the term. The parol evidence introduced tended in no way to affect its character or operation as such. Hence, like the one to Braswell, it did not affect the other half interest inherited by plaintiffs from their mother, but their right, title, and interest in the same remained just as it was before said instrument was executed. Since it appears from these two deeds that Jones' only title, claim, and interest in the land was an undivided one-half and that he only conveyed such half, there

is no such question as to whether he sold the plaintiffs' interest along with his to pay community debts. If he sold his own interest for that purpose, which is not shown by the evidence, such sale could not affect the interest plaintiffs inherited from his mother.

But let it be assumed for the purposes of this case that he did sell all the land in both tracts, the sale including the interest inherited by the plaintiffs from their mother. Under that assumption the sale as to their half interest would be void—the grantees each having notice of plaintiffs' interest at the time of their purchase—unless such sale was made for the purpose of paying debts of the community. Before a sale can be made to pay community indebtedness such debts must exist against the community estate. There was no debt due from the community to the state of Texas when these sales were made. The purchase money would not be due the state for many years afterwards, nor would it be due now according to the terms of the sale. For this reason, it should not be considered as such a debt as would authorize the survivor of the community to sell the property of the estate to pay, as seems to be the holding of the majority of the court. So the unpaid purchase money, which was assumed by the vendees, should not be taken into consideration in determining the question as to whether Jones sold the land for the purpose of paying community debts.

When plaintiffs' father sold the 200 acres to Braswell, according to the undisputed testimony, it is clear that the payment of community debts with the proceeds of the sale was not contemplated by either party to the transaction. It is equally apparent from the evidence that, while a small indebtedness existed against the community, which was afterwards paid, none of the proceeds of such sale was appropriated to its payment. Besides, as this 200-acre tract was the homestead of the family at the time of Mrs. Jones' death, and not subject to the debts of the community, it may be doubted whether the survivor would be warranted under the law in depriving the deceased's children of their interest by selling it to pay community debts.

It is not clear that any of the consideration taken by Jones from Brown "in trade" was for debts contracted for merchandise purchased prior to Mrs. Jones' death; at least, the state of the evidence on this question is such as would make it a matter of fact for the jury to determine. If the views of the law thus expressed are correct, it logically follows that the majority opinion is wrong in principle and the judgment should not be affirmed.

What is thus far said is in some measure predicated upon the hypothesis that the opinion of the Supreme Court in Creamer v. Briscoe, 101 Tex. 490, 109 S. W. 911, 17 L. R. A. (N. S.) 154, 130 Am. St. Rep. 869, is to some extent applicable to this case. I

am satisfied the opinion correctly decides the question involved; and that to some extent it is applicable to the question presented here. In that case the claim to the land was based on the act of August 12, 1870, which contained the following provision: "That every head of a family who has not a homestead, shall be entitled to one hundred and sixty acres of land out of any part of the public domain as a homestead, upon condition that he shall select, locate and occupy the same for three years, and pay the office fees on the same." The facts showed that all the steps necessary to secure the land had been taken before the first wife died except the occupancy of three years which had been commenced and only required to be completed to give title, the wife having died and the husband marrying again before the expiration of three years' occupancy necessary to acquire title, which, being completed, patent issued to the husband. The court held that the land was community property of the husband and the first wife, and that, as between her heirs and the heirs of the second wife, the latter had no interest. Though in this case, the land was sought to be acquired under a different act, the three-year occupancy required had been completed by Jones and his family, and the required proof thereof made, and everything essential to a patent, except paying the state purchase money, which was not due, had been done before Jones made the sales to Braswell and Brown. In the one case everything the law required to complete title, save occupancy for the requisite period, had been done when the first wife died; in the other case (the one at bar) everything the law required to complete title had been done when the wife died and the property sold, except payment of money to the state which was not due. As in the one case the husband had the right to complete his occupancy, which would vest title in the community estate of himself and deceased wife; so, in the other, the payment of the purchase money to the state when it become due would vest complete title in the community estate of Jones and his deceased wife. The plaintiffs in this case had the right to complete their title by making the payment when it became due, and could not be deprived of it by a sale of their father of his community half and the obtaining of patent by an assignee of his vendees by paying the purchase money to the state before it became due.

The question is not whether W. J. Jones could have abandoned the land and forfeited his purchase from the state, but is whether, after his three years' occupancy had been completed and proof thereof made in accordance with the law, he conveyed anything more than his community half interest in the premises. He was not in arrears in the interest or anything due the state on the land; it was not essential for him to occupy the land a day longer for him to obtain the patent; but he could go where he pleased, and, either by paying the interest to the state and the principal of the purchase money as it became due, or by paying the entire purchase money to the state at any time, his three-year occupancy being proved, obtain a patent to the land, which would not divest these plaintiffs of their mother's community interest but, in connection with the other undisputed facts, would be evidence of their title as well as his own; the amount of his obligation to the state for the purchase money was only $780, with interest thereon payable annually at the rate of 6 per cent. per annum, the principal would not be due for 36 years when he sold to Braswell and Brown; the interest was paid up to the date of such sales, and the annual interest thereafter was only $46.80; and there was evidence to show that the property was worth at the time of said sales $15,000. Now, I fail to perceive that the debt was onerous as conceived by the majority of the court. What man, who has staggered under the burden of debt, would conceive a debt for $780, with the rate of interest at 6 per cent. per annum, which represented $15,000 worth of property, onerous? It seems to me that any man for such a consideration would jump at the chance of taking upon himself such an inconceivably onerous debt, and would find its yoke easy and the burden light.

The evidence does not tend to show that Jones was not amply able to pay the debt as it became due, nor that he made the sale to relieve himself of the burden of the debt. I cannot believe that the law will permit children of a deceased member of a community to be deprived of the interest of their deceased parent in property worth $15,000, by their father's selling all his right, title, and interest in it in discharge of a community debt of less than $1,000. Because a great law of nature has deprived these plaintiffs of their mother, the great law of man should not, by one of its fictions, deprive them of the property they inherited from her.

The defendant Sadler was charged with notice of the plaintiffs' interest in the land both by the quitclaim deeds in his chain of title and the pendency of the suit at the time of his purchase. Hence, he cannot be regarded as a purchaser in good faith, nor be entitled to the value of improvements made on the land upon the ground of good faith, nor claim that limitations ran against plaintiffs in his favor. Therefore, he holds the legal title of plaintiffs' one-half interest in the land in trust for them subject to his right to be reimbursed by them for the one-half of the purchase money and interest which he paid the state when it becomes due, if he has not already been reimbursed by the value of his use and occupation of the premises.

I think the judgment of the district court

should be reversed, and that, if not rendered here for appellants, it should be remanded for a new trial in accordance with this opinion.

### On Motion for Rehearing.

FLY, J. The record fails to indicate that W. J. Jones made proof of occupancy, but appellants attach to their motion for rehearing what purports to be a copy of proof of occupancy made by Jones after he had sold to Braswell and had removed from the land, which of course is no part of the record and cannot be considered.

The facts of this case disclose that W. J. Jones had bought a tract of public land from the state; that he was a married man; that he entered into the obligations required by law in regard to the land; that he made a small payment on it; that less than two years after the land was purchased Mrs. Jones died; that W. J. Jones and his children continued to live on the land until September 14, 1896, when he sold 200 acres of the land to Braswell and removed to Rosenberg, and in April, 1897, the remaining 120 acres of land was sold by Jones to Brown. At the time of the death of Mrs. Jones community debts existed to Brown, Westendorf, and Bailey, and the obligations to the state for the land were in full force and effect. The debts were not settled by W. J. Jones until after the sale of the land. The debts to Westendorf and Bailey were settled after the sale to Braswell, and the debt to Brown was settled by the sale to him. Braswell and Brown assumed the debts to the state. It was not disclosed how much W. J. Jones owed Westendorf and Bailey, but he admitted owing Brown $100 that was contracted before the death of his wife, while Brown stated it was $300. The debts were paid after the land was sold, and if the identical money that was received from Braswell was not paid to Westendorf for funeral expenses and to Bailey for medical bills, it would not matter, but it is significant that they were not paid for more than two years after the death of Mrs. Jones, and after the sale to Braswell.

[7] The power of Jones to sell was dependent upon the existence of some claim against the community, and Braswell and Brown were under no obligations to inquire into anything except the existence of debts, and the intentions of Jones as to the disposition of the proceeds of the land could not affect their rights, and neither would the fact that the proceeds of the sale largely exceeded the amount of the community debts. Johnson v. Harrison, 48 Tex. 257; Wenar v. Stenzel, 48 Tex. 484. No duty devolved on the purchasers to see that the purchase money was appropriated to the payment of debts. If the purchaser knew there were debts, as both in this case did, and did not act in collusion with the seller to defraud his children, which is not pretended, the secret intentions of the seller to appropriate the money to other purposes than the payment of debts, could not invalidate the sale, and especially would this be true after the property had passed through the hands of persons who have paid valuable considerations for the land without notice of adverse claims. This was held in the case of Sanger v. Moody, 60 Tex. 96, where the facts showed an exchange of community property for other property and the court said: "The property in controversy was not sold for money, but was exchanged for other property, and if the property remained in the hands of the original purchaser there might be some question as to the propriety and validity of such a transaction by a survivor; however, in a given case, such an exchange might be a legitimate method of realizing money indirectly for the purpose of paying debts." It was further held in that case that "the power of the survivor is certainly a general power to sell for the purpose of paying any and every debt the community estate may owe," and that "the purchaser under sales such as the present is not bound to see to the application of the purchase money." Only one community debt was proved in that case.

W. J. Jones stated that he did not remember stating to Braswell or Brown his reasons for selling the land, and what his secret intentions were could not in any manner have affected the validity of the sale, and consequently his testimony as to what his intention was in making the sale made no issue to be submitted to a jury. It was uncontroverted that community debts existed, and the testimony of Brown to the effect that his recollection was that Jones sold the land to him to settle his debt and also get a little cash was not contradicted.

It would be a monstrous doctrine to enunciate, that the title of innocent purchasers for value of property could be destroyed by proof of the secret intentions of a survivor years before to not use the proceeds of the sale of community property for the payment of community debts. If such be the law it would place in the hands of the survivor a terrible instrument to be used in favor of his children against a purchaser, who would be defenseless because unable to meet such a phase of evidence. No such menace can be permitted to hang over the purchaser of community estate. He is charged with nothing but proof of the existence of community debts, and when that proof is made his duty ceases, and what the secret intention of the survivor in making the sale may have been is a matter of no concern whatever to him. It follows, therefore, that what Jones' intentions may have been did not present an issue to go to the jury. Braswell swore that Jones led him to believe that the former was buying all the land, when he paid Jones $900

and assumed the debt due the state. There was no issue to be submitted to a jury.

The motion for rehearing is overruled.

NEILL, J. (dissenting). The motion for rehearing should be granted in this case, for the reasons indicated in the dissenting opinion. It is shown indisputably that the land in controversy was the community property of W. J. Jones and his deceased wife, Ara J. Jones; that the appellants are the heirs of Ara J. and inherited her community half interest, and have done nothing to divest them of such interest; that the surviving husband made quitclaim deed conveying all his right, title, claim, and interest in the premises to those under whom the appellees claim; that the appellee, Saddler, was a purchaser pendente lite.

It has been generally held from Robinson v. McDonald, 11 Tex. 385, 62 Am. Dec. 480, down to Burns v. Parker, 137 S. W. 705, that the surviving husband cannot convey a greater interest in community property than one-half. If, therefore, W. J. Jones had assumed to convey the entire property, instead of all his right, title, claim, and interest in it, the effect of his conveyances would have been to convey only his half interest, his vendees having knowledge of the fact that it was the community property of himself and deceased wife, unless the sales were made for the purpose of paying debts of the community.

The burden of proving that the sale of community property was made for the purpose of paying community debts is always upon the vendees of the survivor of those holding under them. And as there is no presumption of law or of facts which relieves them of such burden, it is difficult for the ordinary legal mind to perceive anything *monstrous* in the intention of the survivor of the community, however secret such intention may be, not to use the proceeds of the sale in payment of community indebtedness, especially when there was no understanding between him and his vendee when the sale was made that the proceeds should be used for such purpose. If a "monstrous doctrine" of injustice is to be conjured, it could be more readily adjured when the community interest of the heirs of the deceased spouse is taken from them by a court on a deed of the survivor of the community which upon its face only purports to convey his interest in property of such estate.

That Jones led Braswell to believe that he was buying all the land cannot in any way affect the deed made by the former to the latter, for, as is said in the majority opinion, "the deed was the best evidence of what was conveyed thereby." As is held in Gladys City Oil, etc., Co. v. Right of Way Oil Co., 137 S. W. 171: "It is a cardinal rule that deeds must be so construed as to effectuate, if possible, the intention of the grantor. This intention is to be gathered from the entire instrument. If the expressed meaning is plain upon the face of the instrument, it will control. Effect and meaning must be given to every part of the deed; each clause being considered separately and being governed by the intent deducible from the entire instrument, and separate parts being viewed in the light of other parts. The intent must be primarily gathered from a fair consideration of the entire instrument and the language employed therein, and should be consistent with the terms of the deed, including its scope and subject-matter"—citing 13 Cyc. 601 et seq.; Hancock v. Butler, 21 Tex. 804; Simonton v. White, 93 Tex. 56, 53 S. W. 339, 77 Am. St. Rep. 824; Armstrong v. Lake Champlain Granite Co., 147 N. Y. 495, 42 N. E. 186, 49 Am. St. Rep. 683.

If it should be conceded that the sales of the land by Jones to Braswell and Brown conveyed all the land (which concession would be directly contrary to the obvious import and meaning of the deeds) still, it not appearing from the evidence, as a matter of law, that such sales were made for the purpose of paying community indebtedness of Jones and his deceased wife, the question as to whether they were made for such purpose, being matters of fact, should, at least, have been submitted to the finding of the jury.

For these, and the reasons given in the dissenting opinion, this motion should be granted, and the judgment of the district court reversed and the cause remanded for a new trial.